## CTI–CONTAINER LEASING CORPORATION, Plaintiff-Appellee,

v.

## OCEANIC OPERATIONS CORPORATION, Defendant-Appellant.

No. 804, Docket 81–7843.

United States Court of Appeals, Second Circuit.

Argued March 17, 1982.

Decided June 28, 1982.

Kieron F. Quinn, New York City (Geoffrey S. Tobias, Richard A. Schafrann, Ober, Grimes & Shriver, New York City, on the brief), for plaintiff-appellee.

Alfred F. Koller, Jr., New York City (Joseph F. DeMay, Jr., Cichanowicz & Callan, New York City, on the brief), for defendant-appellant.

Before TIMBERS, MESKILL and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant-appellant Oceanic Operations Corporation ("Oceanic") appeals from so much of an order of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, as denied Oceanic's motion to dismiss the present action for want of admiralty jurisdiction and granted summary judgment against Oceanic on the issue of its liability to plaintiff-appellee CTI-Container Leasing Corporation ("CTI"). The principal issue on appeal concerns the scope of the federal courts' admiralty jurisdiction. Specifically, we must decide whether a contract for the lease of cargo shipping containers is sufficiently "maritime" that a suit for its breach is properly within our admiralty jurisdiction. In the circumstances of this case we agree with the district court that the lease agreement was a maritime contract and that partial summary judgment was appropriate.

## FACTS

The pertinent facts are not in dispute. CTI is in the business of leasing cargo shipping containers. Oceanic is an agent for several steamship lines. Neither party owns or operates ships. In November 1977, CTI and Oceanic entered into a written lease agreement pursuant to which CTI agreed to rent to Oceanic up to 170 forty-foot standard steel and aluminum containers. The containers were to be delivered by CTI in Norfolk, Virginia, and were to be returned to CTI by Oceanic in Manila, Philippines. Oceanic agreed to pay a per-container rental of $438 for the first 90 days plus $4.20 per day thereafter. Oceanic also agreed to pay $4,400 for any container lost or destroyed, and agreed to maintain the leased containers in good repair.

In accordance with the lease, CTI delivered 169 containers in Norfolk, Virginia in

late 1977. In July 1978 the containers, loaded with cargo, arrived in Manila aboard the KARATACHI MARU, a ship chartered by Ocean Transport Line Inc. ("Ocean Transport"). In Manila, however, the Philippine consignee failed to pay customs duties, and the cargo-laden containers were seized by the Philippine government. Nearly three years passed before the duty was paid and the shipment released, and the containers were eventually redelivered to CTI in Manila in April 1981. During the Philippine government's retention of the containers, Oceanic paid the agreed rental only until May 1980.

CTI commenced the present suit against Oceanic to recover unpaid rental for 1980 and 1981, plus repair charges resulting from Oceanic's alleged failure to return the containers in undamaged condition. CTI premised jurisdiction on 28 U.S.C. § 1333 (1976), which grants the district courts jurisdiction over suits in admiralty.[1] Oceanic opposed the action principally on the grounds that the lease was not a maritime contract and the court therefore had no admiralty jurisdiction, and that in any event Oceanic had been acting solely as an agent for Ocean Transport and thus had no liability under the lease. CTI moved for summary judgment on its contract claim, contending that no material facts were genuinely in dispute, and Oceanic cross-moved for summary judgment dismissing the complaint for lack of subject matter jurisdiction. In an opinion dated October 30, 1981, reported unofficially at 1981 A.M.C. 2964, the district court denied Oceanic's motion to dismiss,[2] granted partial summary judgment to CTI on the issue of liability, and referred the question of damages to a magistrate. This appeal followed.[3]

## DISCUSSION

On appeal, Oceanic renews its contention that the agreement sued upon is not a "maritime contract," and argues that there are disputed questions of material fact as to its liability. We find no merit in either contention.

### A. Admiralty Jurisdiction

■ The precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive. "The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961). If the contract is a "maritime contract," it is within the federal court's admiralty jurisdiction. See id. Traditional texts have defined a "maritime" contract as one that, for example, "relat[es] to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment," 1 E. Benedict, Benedict on Admiralty § 183, at 11-6 (7th ed. 1981), or as one "for the furnishing of services, supplies or facilities to vessels . . . in maritime commerce or navigation." 7A Moore's Federal Practice ¶ .230[3], at 2773 (2d ed. 1948) (emphasis omitted). See also Kossick v. United Fruit Co., supra, 365 U.S. at 736, 81 S.Ct. at 890 ("'The only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce . . . .'") (quoting 1 E. Benedict, The Law of American Admiralty 131 (6th ed. 1940)).

■ The definitions have proved easier to state than to apply, as seemingly incom-

---

1. 28 U.S.C. § 1333 provides, in pertinent part, that "[t]he district courts shall have original jurisdiction . . . of: (1) Any civil case of admiralty or maritime jurisdiction . . . ." The parties agree that admiralty is the only possible basis for federal jurisdiction over the subject matter of the present case.

2. The court also denied an alternative motion by Oceanic to amend its answer in order to

assert a counterclaim, a matter that Oceanic has not pursued on appeal.

3. 28 U.S.C. § 1292(a)(3) (1976) permits appellate review of interlocutory orders that determine the rights and liabilities of the parties to admiralty suits in which appeals from final decrees are allowed.

patible results abound.[4]  In general we seek guidance from rulings in like or analogous situations in order to arrive at a reasoned decision in the circumstances at hand.  *See Kossick v. United Fruit Co., supra*, 365 U.S. at 735, 81 S.Ct. at 890 ("Precedent and usage are helpful insofar as they exclude or include certain common types of contract. . . .").

The question whether a contract for the acquisition of cargo shipping containers is a maritime contract has apparently provoked little comment.  The use of such containers, which are portable receptacles in which large numbers of smaller packages may be transported, is a relatively recent development that "enables the use of two or more modes of transportation, marine, motor, rail, or air, to transport goods on a door-to-door basis."  Tombari, *Trends in Ocean-borne Containerization and Its Implications for the U.S. Liner Industry*, 10 J. Mar. L. & Com. 311, 311 (1979).  Characterized by one commentator as "[o]ne of the most important technological developments in the transportation of goods by sea since steam replaced sail," Simon, *The Law of Shipping Containers*, 5 J. Mar. L. & Com. 507, 507 (1974), containerization has revolutionized maritime cargo-handling techniques.  As the Supreme Court has described it,

> containerization permits the time-consuming work of stowage and unstowage to be performed on land in the absence of

the vessel.  The use of containerized ships has reduced the costly time the vessel must be in port and the amount of manpower required to get the cargo onto the vessel.

*Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 270, 97 S.Ct. 2348, 2360, 53 L.Ed.2d 320 (1977) (footnote omitted).  Consequently, in a variety of contexts, the container has been characterized as "a modern substitute for the hold of the vessel," *id.*, and as " 'functionally a part of the ship,' " *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 443, 99 S.Ct. 1813, 1818, 60 L.Ed.2d 336 (1979) (quoting *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971)).[5]

Given the function of the container and the growing dependence of the maritime industry on containerization, a shipowner's lease of containers has been held a maritime contract, *Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.*, 476 F.Supp. 119 (S.D.N.Y.1979), much as other agreements for the acquisition of ship equipment have been viewed as maritime contracts, *e.g., Radiomarine Corp. v. Gulf Northern Co.*, 394 F.Supp. 381 (E.D. Mo.1975) (radio and radar systems); *Houston-New Orleans, Inc. v. Page Engineering Co.*, 353 F.Supp. 890 (E.D.La.1972) (control panel for crane mounted on ship).  We concur in the view that a lease of cargo con-

---

4. For example, it is well established that a contract to build a ship is not maritime, *The People's Ferry Co. v. Beers*, 61 U.S. (20 How.) 393, 15 L.Ed. 961 (1857), while a contract to repair a ship is, *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922); 1 E. Benedict, *supra*, §§ 188, 189, at 11-34—11-40.  A "general agency" agreement is outside admiralty jurisdiction, *P.D. Marchessini & Co. v. Pacific Marine Corp.*, 227 F.Supp. 17 (S.D.N.Y.1964), while a contract for managing a ship is within it, *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir. 1961).  A contract to procure a policy of marine insurance is non-maritime, *F.S. Royster Guano Co. v. W.E. Hedger Co.*, 48 F.2d 86 (2d Cir.), *cert. denied*, 283 U.S. 858, 51 S.Ct. 651, 75 L.Ed. 1464 (1931), while a contract for marine insurance is maritime.  *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).  A contract to purchase a vessel is outside admiralty jurisdiction, *Econo-*

*mou v. Bates*, 222 F.Supp. 988 (S.D.N.Y.1963), while a contract to charter or hire a vessel is within it, *Fisser v. International Bank*, 175 F.Supp. 305 (S.D.N.Y.1958).

5. None of these cases dealt with the maritime nature of a lease of containers, and each clearly arose in a maritime context.  *See Japan Line, Ltd. v. County of Los Angeles, supra* (local tax on containers used on Japanese ships in commerce with United States); *Northeast Marine Terminal Co. v. Caputo, supra* (applicability of Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (1976), to longshoremen injured while unloading containers that had been removed from ships); *Leather's Best, Inc. v. S.S. Mormaclynx, supra* (applicability of $500 package limitation in Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5) (1970) to the container as a whole rather than to packages within).

tainers for use on a ship is a maritime contract.

█ The case before us focuses principally on the antecedent question of whether the agreement between CTI and Oceanic leased containers for use on a ship. Since containers may be used not only in ocean transport, but also in overland transport by truck or train or in overseas transport by freighter airplane, *see, e.g.,* Schmeltzer & Peavy, *Prospects and Problems of the Container Revolution,* 1 J. Mar. L. & Com. 203, 204–06 (1970); Tombari, *Trends in Ocean-borne Containerization and Its Implications for the U.S. Liner Industry, supra,* Oceanic argues that the containers leased here could have been used for purposes other than ocean transport, and that the lease has no necessarily maritime flavor.[6] Our review of the record persuades us that the district court properly viewed the lease between CTI and Oceanic as indicating that the containers would be transported by ship.

First, although the lease does not mention a ship or ships as such, it contains several provisions that point to shipping as the envisioned mode of use of CTI's containers. Since the containers were to be delivered by CTI in the United States and returned to CTI in the Philippines, overseas transport obviously was envisioned. Further, Clause 12 of the lease suggests that it was anticipated that transport to Manila would be by sea rather than by air, since that clause refers to the "point[s] or port[s]" of original delivery and redelivery, rather than to delivery at an air terminal. *See* Schmeltzer & Peavy, *Prospects and Problems of the Container Revolution, supra,* 1 J. Mar. L. & Com. at 206 ("the movement of a container consolidated at a port or air terminal and shipped to an overseas port or air terminal . . . is termed a 'port-to-port' or 'air terminal-to-terminal' shipment."). In addition, Clause 8 of the lease, which required Oceanic to obtain insurance, refers to "Particular Average and General Averages," concepts of peculiar ap-

plicability to sea ventures. *See Black's Law Dictionary* 172, 813 (4th ed. 1951). Further, it is undisputed that Oceanic at all relevant times was an agent for several steamship lines. Since there is no indication in the record that it acted as agent for airlines, railroads, or trucking companies, the nature of Oceanic's business also suggested that the containers were sought for ocean transport.

█ Finally, we note that Oceanic has sought to escape liability in this action on the ground that it disclosed in the lease negotiations that the real lessee of the containers was to be Oceanic's principal, Ocean Transport, a commercial shipowner. While any such oral disclosures by Oceanic are not admissible to relieve it from liability on the lease, *see* part B, *infra,* we are not required to close our eyes to the light shed by Oceanic's statements on the nature of the contract. Oceanic correctly concedes that a lease of the containers directly to Ocean Transport would have been a maritime contract. *See Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd., supra.* We see no basis in logic to conclude that the present lease was not a maritime contract merely because Ocean Transport chose to acquire the containers through an agent. *Accord, Maryland Port Administration v. SS American Legend,* 453 F.Supp. 584, 589–90 (D.Md.1978).

In the circumstances, we agree with the district court that the containers were leased for use in ocean transportation, and given the nature of such a container as the functional equivalent of the hold of the vessel, we must conclude that such a lease is a maritime contract. Accordingly, Oceanic's motion to dismiss for lack of admiralty jurisdiction was properly denied.

### B.  *Oceanic's Liability*

Oceanic's contention that summary judgment as to its liability was improper need not detain us long. Oceanic's argument is

---

**6.** Oceanic also argues that the lease was partially nonmaritime because after the containers were seized by the Philippine government they were held on land. We find no merit in this or any of Oceanic's other arguments.

that there was a genuine issue of fact as to whether Oceanic orally disclosed to CTI in the lease negotiations that Oceanic was acting not on its own account but solely as agent for another. The district court properly rejected this argument as a matter of law.

The general rule is that the terms of an unambiguous, integrated contract may not be varied by parol evidence. *See* Restatement (Second) of Contracts § 213 (1979). As this principle is applied to the question whether a person who has signed a contract may escape liability for its breach on the ground that he was acting solely as an agent, the general corollary is that "[i]f the fact of agency does not appear in an integrated contract, an agent who appears as a party thereto can not introduce extrinsic evidence to show that he is not a party . . . ."[7] Restatement (Second) of Agency § 323(3) (1957). New York law, which the lease specified was to be controlling, conforms to these general rules.[8] *See, e.g., Sabo v. Delman,* 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 717 (1957) ("The parol evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument . . . ."); *Meyer v. Redmond,* 205 N.Y. 478, 98 N.E. 906, 908 (1912) ("*Even where [the agent] discloses the name of his principal, if he signs a written contract in his own name merely, which contract does not upon its face show that he was acting as the agent of another, . . . he will be personally bound thereby.*") (quoting, with emphasis, *Magee v. Atkinson,* 2 Mees. & Wels. R. 440); *see also John Minder & Son v. L. D. Schreiber Co.,* 73 F.Supp. 477, 480–81 (S.D.N.Y.1947) (discussing New York law).

The undisputed facts of the present case place it squarely within these general principles. The lease is, as the district court found, unambiguous. *See* Restatement of Agency § 323, comment *a* (ambiguity *vel*

*non* "is a question to be decided by the judge"). The lease was quite plainly an integrated contract, as Clause 15 provided that "[t]his lease contains the entire Agreement between the parties with respect to the subject matter hereof, and may not be amended, altered or modified except by a writing signed by both parties." Oceanic concedes that "[t]he lease does not state the fact of [Oceanic's] agency nor does it identify [Oceanic's] principal." (Brief on appeal at 3). Since Oceanic signed the unambiguous, integrated agreement in its own name and the fact of agency nowhere appears therein, Oceanic is not entitled to introduce evidence to show that it was not the real lessee. Summary judgment as to Oceanic's liability was properly granted.

### CONCLUSION
The order of the district court is affirmed.

---

7. There are limited exceptions to the general rule that are not applicable here. *See id.* §§ 323(3)(a), (b).

8. Since New York law in this regard is the same as the generally prevailing principles we need not reach the question whether a choice of law provision in a maritime contract must be given effect by the courts.