**PERALTA SHIPPING CORPORATION, Plaintiff-Appellant,**

v.

**SMITH & JOHNSON (SHIPPING) CORP., Defendant-Appellee.**

**No. 951, Docket 83–7922.**

United States Court of Appeals, Second Circuit.

Argued March 22, 1984.

Decided July 11, 1984.

Michael G. Chalos, New York City (Peter Skoufalos, Halley & Chalos, New York City, on the brief), for plaintiff-appellant.

Thomas D. Toy, New York City (Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, on the brief), for defendant-appellee.

Before LUMBARD, NEWMAN and PRATT, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Navigating the jurisdictional channels of the federal courts' admiralty jurisdiction sometimes presents a choice between observance of ancient landmarks and heeding the siren call of the commentators to venture out into uncharted waters. The choice is put to us squarely by this appeal in which we are asked to abandon the longstanding rule that suits upon general agency contracts are not within the jurisdiction

of the silver oar. The request is made by plaintiff-appellant Peralta Shipping Corp. ("Peralta") in its appeal from a judgment of the District Court for the Southern District of New York (Vincent L. Broderick, Judge), dismissing for lack of subject matter jurisdiction Peralta's complaint against defendant-appellant Smith & Johnson (Shipping) Corp. ("S & J"). Though we find considerable merit in the arguments favoring classification of general agency and sub-agency agreements as "maritime contracts" cognizable in admiralty, we feel bound by controlling precedent of the Supreme Court and this Court to affirm the judgment of the District Court.

### Facts

Peralta, a New York corporation, is the general agent in the United States, Mexico, and the Panama Canal Zone for the Bangladesh Shipping Corporation (also known as Bangladesh National Lines) ("Bangladesh"), an operator of several ocean-going cargo vessels. On July 5, 1979, Peralta and S & J, also a New York corporation, executed an agreement entitled "Agency Agreement," whereby Peralta appointed S & J as "Gulf agents" responsible for arranging services for all Bangladesh vessels calling at ports between Brownsville, Texas, and Tampa, Florida.

S & J's principal obligations under the "Agency Agreement" were as follows:

S & J shall act as ships' husbanding agents for [Bangladesh's] vessels at the [Gulf] ports and shall perform the services normally incident thereto, including arranging for entrance and clearance of vessels at the Custom House, execution of all Custom House documents incidental thereto, arranging for fuel, water, provisions, emergency repairs, port charges and other similar matters, and for stevedoring, storage and other cargo handling; arranging for tugs ...; assisting in the procuring/repatriating necessary ship's personnel as requested by the

Master; hospitalization of officers and other crew members; and shall issue bills of lading to shippers and passenger tickets to passengers as Agents as required; and shall use its best efforts in soliciting and securing cargoes in developing traffic and passengers for [Bangladesh's] vessels.

[S & J shall appoint sub-agents] in all ports where S & J does not have its own offices ....

S & J will arrange for all services necessary for the prompt turnaround of vessels, including all matters of a ship husbanding nature, and will have qualified superintendents in attendance as necessary so as to at all times insure adequate supervision and the efficient working of the vessel, the cost of which is to be borne by S & J.

At a deposition Robert Johnson, President of S & J, summarized S & J's responsibilities more broadly—"to handle [Bangladesh's] vessels at [the Gulf] ports, to shift cargo, enter and clear the vessels,[1] supervise the loading of the vessels and account for the disbursements and expenditures and to collect and remit freights."

Two years later, on September 10, 1981, Peralta commenced the present action. Although not specifically grounding jurisdiction on 28 U.S.C. § 1333 (1982), which grants the district courts jurisdiction over suits in admiralty, Peralta alleged the maritime nature of its suit: "This is an admiralty and maritime claim within the meaning of F.R.Civ.P. 9(h)." Peralta claimed that S & J had breached the "Agency Agreement" and sought an accounting and recovery of monies wrongfully retained by S & J—(i) freight collected on Bangladesh vessels in S & J's agency, and (ii) monies advanced by Peralta to pay Bangladesh's vessels' suppliers and vendors but improperly diverted by S & J. In its answer S & J contested admiralty jurisdiction, but the issue was

---

1. Although the record is somewhat unclear, it appears that S & J "hired" itself to act as stevedore for Bangladesh ships at the port of New Orleans. This fact may explain the difference between S & J's contractual obligations and Johnson's broader description of the duties performed by S & J.

not presented for a ruling by a motion to dismiss.

Peralta subsequently moved for summary judgment, alleging as undisputed S & J's debt in the amount of $112,831.27. S & J did not challenge the amount of the sum claimed, but maintained that it was entitled to summary judgment on the ground that its sister corporation, Smith & Johnson (Gulf), Inc., a bankrupt Louisiana corporation, had assumed, with Peralta's consent, sole responsibility for S & J's obligations under the Agency Agreement.

Judge Broderick initially granted Peralta's motion for summary judgment and found S & J liable in the amount of $112,-831.27. The District Judge rejected S & J's contention that it had been relieved of its contractual obligations. Prior to the entry of final judgment, however, the District Court, on its own motion, questioned its jurisdiction over this action. After the parties briefed the issue, Judge Broderick concluded that the sub-agency contract under which S & J acted as local port agent for Bangladesh's vessels was not a maritime contract within the Court's admiralty jurisdiction. He relied upon our opinion in *CTI-Container Leasing Corp. v. Oceanic Operators Corp.*, 682 F.2d 377, 380 n. 4 (2d Cir.1982), and Judge Weinfeld's opinion in *P.D. Marchessini & Co. v. Pacific Marine Corp.*, 227 F.Supp. 17 (S.D.N.Y.1964). Since S & J did not advance any other basis for federal jurisdiction, Judge Broderick dismissed the complaint pursuant to Fed.R. Civ.P. 12(h)(3). This appeal followed.

In support of the District Court's decision, S & J invokes the authority of venerable precedents establishing the general rule that general agency contracts are not cognizable in admiralty. Peralta invites us to distinguish the cited authorities on the ground that S & J's contractual obligations went beyond those of a general agency agreement or, in the alternative, to expand the jurisdictional boundaries to incorporate general agency contracts such as the one at issue.

## Discussion

As the Supreme Court has recognized, "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961). Neither the Constitution nor applicable statutes lay down criteria for drawing the boundary between maritime and non-maritime jurisdiction. The framers of the Constitution did not undertake to mark the limits of admiralty jurisdiction; Article 3, Section 2 of the Constitution simply extends the judicial power of the United States "to all Cases of admiralty and maritime jurisdiction." And although Congress has expressly included certain transactions or events within admiralty,[2] it has not sought to outline a general demarcation between maritime and non-maritime concerns.[3]

In the absence of express guidance, courts and commentators have struggled to determine how to vindicate the purpose underlying the grant of jurisdiction—protecting the national interest in uniform judicial

---

**2.** *See, e.g.,* Ship Mortgage Act, 46 U.S.C. § 911 *et seq.* (mortgages); Federal Maritime Lien Act, 46 U.S.C. §§ 971–975 (creating maritime lien for services or supplies furnished to a vessel); Death on High Seas Act, 46 U.S.C. § 761 *et seq.* (death outside territorial waters); *see generally Detroit Trust Co. v. The Thomas Barlum,* 293 U.S. 21, 44–46, 55 S.Ct. 31, 38–39, 79 L.Ed. 176 (1934) (upholding constitutionality of Ship Mortgage Act) (detailing history of Congressional action with respect to admiralty jurisdiction).

**3.** Most prominently, the Judiciary Act of 1789 conferred admiralty jurisdiction on the district courts in most general terms:

Sec. 9. And be it further enacted, that the district courts ... shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction ... saving to suitors, in all cases, the rights of a common law remedy, where the common law is competent to give it ....

1 Stat. 76 (1789), Rev.Stat. § 711 (1875). The "savings clause" was amended in 1948 to state "saving to suitors ... any other remedy." 28 U.S.C. § 1333.

supervision of the concerns of maritime shipping. With respect to maritime contracts, courts' and commentators' competing jurisdictional "definitions" share a common focus—the relationship between the subject matter of the contract and the concerns of the maritime industry. Under Justice Story's formulation admiralty jurisdiction "extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." *De Lovio v. Boit*, 2 Gall. 398, 7 F.Cas. 425, 444 (C.C.D. Mass.1815) (No. 3,776). In *North Pacific S.S. Co. v. Hall Brothers Marine Ry. & S. Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed. 510 (1918), the Supreme Court described the inquiry as follows: "in matters of contract it depends upon the subject-matter, the nature and character of the contract ... the true criterion being the nature of the contract, as to whether it have reference to maritime service or maritime transactions." *Kossick v. United Fruit Co., supra*, 365 U.S. at 736, 81 S.Ct. at 890, adopted Benedict's approach: "'The only question is whether the transaction related to ships and vessels, masters and mariners as agents of commerce ...'" (quoting 1 E. Benedict, *The Law of Admiralty* 131 (6th ed. 1940)). Other commentators define a maritime contract as one "for the furnishing of services, suppliers or facilities to vessels ... in maritime commerce or navigation," 7A J. Moore, *Moore's Federal Practice* ¶ .230[3] (2d ed. 1983), or "principally connected with maritime transportation," Gilmore & Black, *The Law of Admiralty* 31 (2d ed. 1975).

These broad guiding principles have proven difficult to apply. While the resulting conception of maritime jurisdiction "has been one of fairly complete coverage of the primary operational and service concerns of the shipping industry," some "anomalous exceptions" abound. *See* Gilmore & Black, *The Law of Admiralty, supra*, at 22. The lack of a clear line is not surprising. Obviously, not all contracts with any maritime connection warrant invocation of admiralty jurisdiction. Application of the broad verbal formulations cited above requires some limiting recognition "that the actual concerns of the shipping industry may reach as far as the last ranch that sends cattle to port, and, even without stretching the matter at all, maritime transactions are inseparably connected with and shade into the non-maritime," Gilmore & Black, *The Law of Admiralty, supra*, at 29.

The need for consistency and predictability in this area of law suggests that special deference be accorded to prior rulings. "Precedent and usage are helpful insofar as they exclude or include certain common types of contract," *Kossick v. United Fruit Co., supra*, 365 U.S. at 735, 81 S.Ct. at 890; "[i]n general we seek guidance from rulings in like or analogous situations in order to arrive at a reasoned decision in the circumstances at hand," *CTI-Container Leasing Corp. v. Oceanic Operations Co., supra*, 682 F.2d at 380; "[t]o the modern student ... the high-level concepts that have been suggested as keys to the definition, may be of interest, but he ought also to be aware that certain fields, without arguing the matter, may now be taken as settled within the jurisdiction, and others as equally certainly excluded from it." Gilmore & Black, *The Law of Admiralty, supra*, at 22.

■ A demarcation of ancient vintage, consistently recognized from the earliest days, is that agreements preliminary to a maritime contract are not cognizable in admiralty. An early defense of this rule has been of enduring influence.

> The distinction between preliminary services leading to a maritime contract and such contracts themselves have been affirmed in this country from the first, and not yet departed from. It furnishes a distinction capable of somewhat easy application. If it be broken down, I do not perceive any other dividing line for excluding from the admiralty many other sorts of claims which have a reference, more or less near or remote, to navigation and commerce. If the broker of a charter-party be admitted, the insurance

broker must follow,—the drayman, the expressman, and all others who perform services having reference to a voyage either in contemplation or executed.

*The Thames,* 10 F. 848 (S.D.N.Y.1881).

Under this rationale neither an agreement to procure insurance, *F.S. Royster Guano Co. v. W.E. Hedger Co.,* 48 F.2d 86 (2d Cir.), *cert. denied,* 283 U.S. 858, 51 S.Ct. 651, 75 L.Ed. 1464 (1931); *Marquardt v. French,* 53 F. 603 (S.D.N.Y.1893), or crews, *Goumas v. K. Karras & Son,* 51 F.Supp. 145 (S.D.N.Y.1943), *aff'd,* 140 F.2d 157 (2d Cir.), *cert. denied,* 322 U.S. 734, 64 S.Ct. 1047, 88 L.Ed. 1568 (1944), nor an undertaking to act as broker in securing cargo, *The Harvey and Henry,* 86 F. 656, 657 (2d Cir.1898), or a charter party, *Christman v. Maristella Compania Naviera,* 349 F.Supp. 845, 848 (S.D.N.Y.), *aff'd,* 468 F.2d 620 (2d Cir.1972); *Aktieselskabet Fido v. The Lloyd Braziliero,* 283 F.2d 62 (2d Cir.), *cert. denied,* 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922); *The Thames, supra,* have been cognizable in admiralty.

▪ Nor has admiralty jurisdiction extended to general agency contracts that call for "husbanding" a vessel, *i.e.,* arranging for performance of a variety of services preliminary to maritime contracts, such as soliciting cargo or passengers and procuring supplies, crews, stevedores, and tugboats. The Supreme Court so held in *Minturn v. Maynard,* 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1854), where the Court affirmed the dismissal, for want of jurisdiction, of an action by a general agent or broker against its principal, the owners of a steamship. "There is nothing in the nature of a maritime contract in the case .... The case is too plain for argument." *Id.*

This Court has faithfully adhered to the *Minturn* holding. Most prominent among our earlier cases are *Cory Brothers & Co. v. United States,* 51 F.2d 1010, 1011–12 (2d Cir.1931) (Swan, J.), and *Admiral Oriental Line v. United States,* 86 F.2d 201 (2d Cir.1936) (L. Hand, J.), *modified in other respects sub nom. Admiral Oriental Line v. Atlantic Gulf & Oriental S.S. Co.,* 88 F.2d 26 (2d Cir.1937). *Cory Brothers* involved

an agreement to act as the vessel's local agent at Pernambuco, Brazil. Under the terms of the contract, the agent was required "not only to attend to the discharge of cargo at that port but also to book cargo for ports beyond." 51 F.2d at 1011. When the agent sued to recover expenses incurred in defending the steamship from an action for cargo damage brought by a shipper, the District Court dismissed the libel for want of admiralty jurisdiction. Although this Court sustained jurisdiction derived from the Tucker Act, it noted in dicta that "[i]t is difficult, if not impossible, to distinguish *Minturn v. Maynard* from the case at bar, and that decision would seem to be a controlling authority against admiralty jurisdiction of the present suit." *Id.* at 1012.

*Admiral Oriental Line* involved two agency agreements—(i) an operating contract, under which the United States, owner of the vessel, appointed Atlantic Gulf " 'its Agent to Manage, operate and conduct the business of such vessel ... in accordance with the instructions' " of the United States and to " 'man, equip, victual and supply' " the vessel, with compensation based on a percentage of gross receipts, and (ii) a sub-agency agreement under which Atlantic Gulf appointed Admiral Oriental Line " 'General Freight Agents' " for its vessels in the Far East (the line assuming the obligation to appoint sub-agents at ports where it had no offices of its own)— and two lawsuits. 86 F.2d at 203. After successfully defending a shipper's suit against the vessel, the Line sued Atlantic Gulf to recover the litigation expenses. Atlantic Gulf in turn sued the United States for both any damages it might have to pay its sub-agent and its costs in defending against the Line's action. The Court found neither action "cognizable in admiralty; they are on all fours with *Minturn v. Maynard,* 17 How. 477, 15 L.Ed. 235, a case which the Supreme Court has never either overruled or even modified." *Admiral Oriental Line v. United States, supra,* 86 F.2d at 203. On reconsideration the Court explicitly stated that it would apply *Minturn*'s holding to "managing operator"

agreements: *Minturn* "still seems to us flat on point. The report is indeed very short, but it states that the libelant was a general ship's agent and broker, and we can see no material distinction between such an agent and a managing operator; if the case is to be overruled, only the Supreme Court should do it." *Admiral Oriental Line v. Atlantic Gulf & Oriental S.S. Co., supra,* 88 F.2d at 27.

Although these authorities have suffered some erosion in other circuits,[4] neither the Supreme Court[5] nor the courts of this Circuit have departed from their teachings. *See, e.g., P.D. Marchessini & Co. v. Pacific Marine Corp., supra,* 227 F.Supp. at 19 (performance of husbanding "within the preliminary or nonmaritime category under the authorities"). As the commentators recognize, *Minturn* 's demarcation remains the general, well-settled rule—general agency contracts are not cognizable in admiralty. *See* 7A J. Moore, *Moore's Federal Practice* ¶ .250 at 3001 n. 1 (2d ed. 1983) (majority rule that agency contracts not maritime contracts) (collecting cases); Gilmore & Black, *supra,* at 28; 1 E. Benedict, *The Law of Admiralty* 131 (6th ed. 1940).

Appellant invites us to distinguish these venerable authorities primarily on the ground that S & J's contractual obligations went beyond those of a traditional general agent and included supervising the performance of maritime contracts procured by it. We decline the invitation. We acknowledge that *Hinkins Steamship Agency v. Freighters, Inc.,* 351 F.Supp. 373 (N.D.Cal.1972), *aff'd,* 498 F.2d 411 (9th Cir. 1974), arguably carved such an exception to the general rule. In *Hinkins* the Ninth Circuit held that where a husbanding agent procures and supervises a variety of maritime services "necessary for the continuing voyage," the contractual arrangement is cognizable in admiralty. But we doubt the virtue of subdividing the category of gener-

---

**4.** In *Hadjipateras v. Pacifica, S.A.,* 290 F.2d 697, 700, 703–04 (5th Cir.1961), Judge Brown upheld jurisdiction over a vessel management contract not unlike that at issue in *Admiral Oriental Line, supra.* The Court concluded that the contract to operate the vessel, obtain freight and collect freight monies "is everything classically known as a maritime contract. It concerns a ship ... its very purpose is to effectuate the physical, economic operation and employment of a vessel." *Hadjipateras v. Pacifica, S.A., supra,* 290 F.2d at 703.

In *Hinkins Steamship Agency v. Freighters, Inc.,* 351 F.Supp. 373 (N.D.Cal.1972), *aff'd,* 498 F.2d 411 (9th Cir.1974), the Ninth Circuit upheld jurisdiction over a husbanding agreement. The Court questioned the continuing validity of *Minturn v. Maynard, supra,* and related precedent, and distinguished these authorities on the grounds that (i) the contract in *Hinkins* did not involve a continuing relationship between agent and principal but rather a voyage-specific contract, (ii) Hinkins' personnel did not merely procure but also supervised maritime services, and (iii) Hinkins' services were "necessary for the continuing voyage." *Id.* at 412. The latter distinctions are discussed in the text, *infra;* the first is properly criticized in Note, *Admiralty Jurisdiction Extends to Agent Who Actually Performs Essential Services for Vessel,* 4 J.Mar.L. Comm. 480, 490 (1973).

The distinction between "preliminary" and maritime contracts has also become somewhat blurred. *See, e.g., Stanley T. Scott & Co. v. Makah Development Corp.,* 496 F.2d 525, 526 (9th Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 66,

**5.** Nothing in *Archawski v. Hanioti,* 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (1956), is inconsistent with *Minturn v. Maynard, supra. Archawski* held that an action on a maritime contract is not within admiralty even though the suit is in the nature of *indebitatus assumpsit.* The Court rejected the view that jurisdiction turns on the nature of relief sought rather than on the subject matter of the action. "[S]o long as the claim arises out of a maritime contract, the admiralty court has jurisdiction over it." *Id.* at 535, 76 S.Ct. at 620. We disagree with those courts that have read the quoted sentence to mean that "preliminary" contracts are within admiralty jurisdiction on the theory that they arise out of a maritime relationship. *See Stanley T. Scott & Co. v. Makah Development Corp., supra,* 496 F.2d at 526; *Interocean Steamship Corp. v. Amelco Engineers Co., supra,* 341 F.Supp. at 997. Such a broad reading of *Archawski* would place virtually all "preliminary" contracts within admiralty. *See Stanley T. Scott & Co. v. Makah Development Corp., supra,* 496 F.2d at 526 (Wallace, J., dissenting).

42 L.Ed.2d 64 (1974) (contract to procure insurance within admiralty since it "arises out of a maritime contract"); *Bergen Shipping Co. v. Japan Marine Services, Ltd.,* 386 F.Supp. 430 (S.D. N.Y.1974) (contract to procure crew cognizable in admiralty); *Interocean Steamship Corp. v. Amelco Engineers Co.,* 341 F.Supp. 995 (N.D.Cal. 1971) (contract to procure stevedoring services within admiralty since it "arises out" of maritime contract).

al agency contracts based on the degree of importance of the services rendered by the agent or on the extent of supervision of performance. In the first place, almost every general agency agreement can be said to involve "necessary" services or some degree of supervision. To predicate jurisdiction on such hair-splitting distinctions would blur, if not obliterate, a rather clear admiralty demarcation. Moreover, as long as *Admiral Oriental Line* remains the law of our Circuit, the distinction espoused in *Hinkins* is unavailable here. In *Admiral Oriental Line*, this Court found no "material distinction," 88 F.2d at 27, between a "managing operator" contract, which required Atlantic Gulf "to manage, operate and conduct the business of such vessel as" the owner may assign and to "man, equip, victual and supply" the vessels, 86 F.2d at 203, and a contract for a ship's general agent. If Atlantic Gulf's "necessary" and "supervisory" services did not warrant admiralty jurisdiction, we would be hard-pressed to conclude that S & J's services do.

We find greater appeal in Peralta's suggestion that the entire class of general agency and sub-agency agreements should be brought into admiralty. We agree with the commentators that the jurisdictional boundaries should reflect the concerns underlying the grant of jurisdiction—the federal interest in promoting and protecting the maritime industry—and that "all those cases involving the enforcement, policing or adjustment of business arrangements as a practical matter primarily concerned with sea, lake and river transport," Black, *Admiralty Jurisdiction: Critique and Suggestions*, 50 Colum.L.Rev. 259, 274–77 (1950), should be within the admiralty. A general agency relationship is intimately related with the shipping industry and would warrant inclusion within admiralty. *See* Gilmore & Black, *The Law of Admiralty, supra*, at 28 n. 94b (criticizing *P.D. Marchessini & Co., supra*, as "of dubious defensibility. It is predicted that the Supreme Court, when the issue reaches it, will hold 'general agency' and other vessel-management agreements within the jurisdiction—along with actions for accountings on them."); 7A J. Moore, *Moore's Federal Practice* ¶ .250 at 3006 (2d ed. 1983) ("Quite clearly, such agreements are an integral part of, and in furtherance of, maritime commerce, and consequently, should be cognizable within the admiralty jurisdiction of the district court.").

■ The prediction of Professors Gilmore and Black may be correct. However, we are not free to anticipate the Supreme Court's overruling of *Minturn v. Maynard*, though we would welcome it. Over forty years ago we indicated that if the rule precluding general agency contracts from admiralty is "to be overruled, only the Supreme Court should do it," *Admiral Oriental Line v. Atlantic Gulf & Oriental S.S. Co., supra*, 88 F.2d at 27. We continue to adhere to that position. The absence of subject matter jurisdiction required dismissal of the complaint.[6]

Affirmed.

6. The District Judge ruled, the appellate briefs assume, and we are obliged to agree that lack of subject matter jurisdiction in the District Court requires us to affirm the judgment dismissing the complaint, even though the District Court has fairly determined, after expenditure of a considerable amount of judicial resources, that the defendant is indebted to the plaintiff in the amount of $112,831.27. Rivaling the precepts of admiralty in ancient lineage is the principle that a judgment entered by a court lacking subject matter jurisdiction may not stand. Indeed, that rule commands virtual unanimity of support. Lack of subject matter jurisdiction has become the jurisprudential equivalent of the plague, requiring instant extirpation whenever noticed, even years after adjudication, *e.g.,* *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951); *Mansfield C. & L.M. Ry. v. Swan*, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Cuff v. Gleason*, 515 F.2d 127 (2d Cir.1975); *Bishop v. N.L.R.B.*, 502 F.2d 1024 (5th Cir.1974), to safeguard the purity of judicial processes from this most dreaded form of contamination.

This writer, speaking only for himself, wonders whether such unquestioning condemnation of judgments entered by courts without subject matter jurisdiction is always warranted. Of course a court that arrogates power to itself without even a colorable claim of authority to adjudicate a dispute cannot be permitted to decree any enforceable rights. And I can readily

agree that all the technical rules of subject matter jurisdiction should be strictly enforced when lack of such jurisdiction is called to the attention of a court at the initial stages of litigation. But when the parties, with actual or constructive knowledge of jurisdictional defects, have been content to let a case proceed through determination of the merits of the dispute and no substantial claim can be made that the court's technical lack of subject matter jurisdiction implicates its competency to adjudicate the dispute or that the forum with acknowledged jurisdiction possesses superior experience or other attributes commending deference to its authority, I see no catastrophe in letting the judgment stand. *See* American Law Institute, *Study of the Division of Jurisdiction Between State and Federal Courts* § 1386 (1969) (advocating modest reform).

The "fundamental" nature of jurisdiction ought to oblige courts to examine its assertion and timely challenge, but it need not require the automatic waste of judicial resources without

even inquiry as to the social costs of retrial in the proper forum. It seems anomalous to permit a criminal defendant to waive his fundamental rights to a jury, a lawyer, and even a trial, yet assert that a civil litigant cannot ever waive lack of subject matter jurisdiction, even when he was the party who invoked the court's jurisdiction, *see American Fire & Casualty Co. v. Finn, supra*, 341 U.S. at 17–18, 71 S.Ct. at 541–42 (defendant invoking removal jurisdiction not estopped from protesting there was no right of removal); *Woodward v. D.H. Overmyer Co.*, 428 F.2d 880, 882 (2d Cir.1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1971) (federal jurisdiction may be challenged at any stage, even by party who invoked it).

Even if I felt at liberty to deem lack of subject matter jurisdiction waivable, affirmance would remain appropriate in this case, since the answer of S & J seasonally disputed the District Court's admiralty jurisdiction and thereby preserved its objection.