**ITEL CONTAINERS INTERNATIONAL CORPORATION, et al., Plaintiffs,**

v.

**ATLANTTRAFIK EXPRESS SERVICE, LTD., et al., Defendants.**

**No. 86 Civ. 1313 (RLC).**

United States District Court, S.D. New York.

Aug. 18, 1987.

Burlingham, Underwood & Lord, New York City (Robert J. Zapf and Alfred E. Yudes, Jr., of counsel), for plaintiff Itel Containers Intern. Corp.

Wilson & Minasi, New York City (Michael D. Wilson, of counsel), for plaintiffs Textainer Inc. and Cross County Leasing Ltd.

O'Melveny & Myers, New York City (Andrew J. Frackman and Robin Dahlberg, of counsel), for plaintiff Flexi-Van Leasing, Inc.

Carter, Ledyard & Milburn, New York City (Lawrence F. Carnevale and James Gadsden, of counsel), for intervenors Strider 4 Inc., Strider 1 Ltd., Nagara Tam Ltd., Nagara Ltd. and Contender 1 Ltd.

## OPINION

ROBERT L. CARTER, District Judge.

These consolidated actions arise from the default by defendant Atlanttrafik Express Service, Ltd. ("AES") on leases it entered into for marine cargo containers and chassis. In its Second Amended Complaint, plaintiff Flexi-Van Leasing, Inc. ("Flexi-Van"), a lessor of the equipment, asserts, *inter alia*, a claim *in rem* against the former vessels of the now-liquidated AES based on a maritime lien to recover unpaid charges on the equipment.[1] The present vessel owners—intervenors Strider 4 Inc., Strider 1 Ltd., Nagara Ltd., Nagara Tam Ltd., and Contender 1 Ltd.—now move for partial summary judgment to dismiss Flexi-Van's *in rem* action to the extent that it

---

1. *See* Second Amended Complaint of Flexi-Van Leasing, Inc. ¶¶ 11–20 ("First Claim for Relief (In rem)").

seeks a maritime lien for unpaid chassis and container charges other than those for per diem rents on containers for periods during which the containers were on board a vessel. The motion is filed pursuant to Rule 56, F.R.Civ.P.[2]

Whether maritime liens may be asserted for charges owing on chassis and containers for periods they were not used on board ship is apparently an issue of first impression not only in this circuit but in any federal court. In light of the growing importance this equipment now plays in modern cargo shipment, the issue before the court is thus one of some moment not only to the litigants but to the shipping industry as a whole. As a result, before addressing the competing claims of the parties, it is appropriate to review not only the applicable law but what has been called the "container revolution." Simon, *The Law of Shipping Containers*, 5 J.Mar.L. & Com. 507, 507 (1974).

## BACKGROUND

Marine containers are large metal boxes used to transport cargo. They are usually 20 or 40 feet long, 8 feet wide, and 8 feet high. Chassis are frames and wheels designed to move containers to and from ports, in and around a port or dock area, and even, in the case of specially outfitted roll-on, roll-off vessels (so-called "ro-ro" vessels), onto the vessel. *See* Simon, *supra*, at 510.

Containerization has become increasingly popular because it offers a far more efficient means of transporting freight than the loose or "break-bulk" shipping of the past, when large quantities of smaller packages would be delivered to the pier by truck or rail, individually unloaded by hand and moved and stacked in a storage area before finally being loaded on board ship for a voyage that would end in a similarly cumbersome and labor-intensive unloading process. Simon, *supra*, at 510–11.

With containerization, a single reusable container holding many smaller packages can be delivered to the pier, put aside until the ship is ready, and loaded and unloaded, all without costly movement of the individual packages. The labor savings are substantial, damage to cargo is reduced, and ships and their crew spend less idle time in port. Simon, *supra*, at 512. As the United States Court of Appeals for the Second Circuit has noted, containerization has so "revolutionized maritime cargo-handling techniques" that it has been "[c]haracterized by one commentator as '[o]ne of the most important technological developments in the transportation of goods by sea since steam replaced sail.'" *CTI–Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380 (2d Cir.1982) (quoting Simon, *supra*, at 507).

Flexi-Van is one of the world's largest container lessors and the largest lessor of chassis in the world. In this action it seeks to recover $2,483,387.64 for AES's default on the lease arrangements. The damages claimed are for per diem rent, repair, insurance, drop-off charges,[3] direct interchange charges,[4] handling charges, charges for lost equipment, and accelerated rent. Second Amended Complaint, ¶¶ 11–20. The vessel owners do not dispute that these charges were never paid, only that the vessels may be subject to maritime liens as a result.

## DISCUSSION

The question of whether Flexi-Van may assert a maritime lien on AES's former

---

**2.** Rule 56(c), F.R.Civ.P. provides in pertinent part that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id. See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

**3.** Like car rental agencies, lessors like Flexi-Van require lessees to return equipment to particular ports or face additional "drop-off" or repositioning charges.

**4.** This charge amounts to an administrative fee assessed when different shipping lines "interchange" equipment among themselves.

vessels turns on the Federal Maritime Lien Act, 46 U.S.C. § 971 *et seq.* ("the Act"). Under the Act, a federal maritime lien creates "a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (*en banc*), *cert. denied,* — U.S. ——, 107 S.Ct. 570, 93 L.Ed.2d 575 (1987). It is "a lien on the vessel," and "has been held to follow the vessel even after it has been sold to an innocent purchaser." *Id.* It serves the "dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." *Id.; see also* G. Gilmore & C. Black, *The Law of Admiralty,* § 9–34 at 657 (2d ed. 1975).

Section 971 of the Act provides that:

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

The vessel owners contend that except for the period during which they are used on board ship, neither chassis nor containers are "necessaries" under the Act. In addition, they argue that the containers and chassis in this case were not "furnished to" the vessels within the meaning of the statute.

Under § 971, "the word 'necessaries' ... should be broadly interpreted: 'The test is whether the supplies or services furnished are reasonably needed in the ship's business.'" *Nautilus Leasing Services, Inc. v. M/V Cosmos,* 1983 A.M.C. 1483, 1483 (S.D.N.Y.1983) (MacMahon, J.) (citation omitted). The term "includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged.... 'It is the present, apparent want of the vessel, *not the character of the thing supplied,* which makes it a necessary.'" *Equilease, supra,* 793 F.2d at 603 (quoting 2 *Benedict on Admiralty* § 34 (7th ed. 1984)) (emphasis added); *see also* G. Gilmore & C. Black, *supra,* § 9–34 at 657–58 & n. 185 (citing cases).

In light of the expansive gloss surrounding "necessaries," it not surprising that all courts which have considered whether containers are necessaries have answered in the affirmative. *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.,* 808 F.2d 697, 700 (9th Cir.1987); *Nautilus, supra,* 1983 A.M.C. at 1483; *Transamerica ICS, Inc. v. M/V Panatlantic,* 1984 A.M.C. 489, 490 (S.D.Fla.1983). The vessel owners do not challenge the validity of these holdings, but seek to distinguish them on the ground that the liens at issue in those cases were only valid to the extent that the containers were in use on board ship. The liens sought in this case, they say, include charges for periods the chassis and containers were not used on board ship. *See* Intervenors' Reply Memorandum of Law at 7–19 *passim.*

It is unclear to what use the containers in the previously reported cases were put.[5] It is clear, however, that the vessel owners'

---

5. *Nautilus Leasing Services, Inc. v. M/V Cosmos,* 1983 A.M.C. 1483 (S.D.N.Y.1983) (MacMahon, J.) and *Transamerica ICS, Inc. v. M/V Panatlantic,* 1984 A.M.C. 489 (S.D.Fla.1983) make no mention of to what use the containers at issue were put. The court in *Flexi-Van Leasing, Inc. v. M/V C.C. San Francisco,* 628 F.Supp. 1077, 1080 (C.D.Cal.1985), *aff'd in relevant part, rev'd on other grounds sub nom. Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.,* 808 F.2d 697 (9th Cir.1987) held that the maritime lien

encompassed all periods the "containers served as the functional equivalent of the hold of the [ship], *including incidental land use," Flexi-Van, supra,* 628 F.Supp. at 1080. The circuit court, however, seemed to read the district court's holding narrowly. *Foss Launch, supra,* 808 F.2d at 700 ("We note without deciding that proof of excess leasing of containers in relation to the capacities of a single vessel or fleet of vessels might undermine a materialman's claim to having furnished 'necessary' items to a vessel").

analysis misses the mark. As noted, it is the need of the vessel, *"not the character of the thing supplied,* which makes it a necessary." *Equilease, supra,* 793 F.2d at 603 (quoting Benedict on Admiralty, *supra,* § 34) (emphasis added). Thus, as far back as 1931 this court, upholding a maritime lien for unpaid taxi fare necessary to bring provisions to a crew, held that the fact that "the services were performed on land ... would not make them non-maritime." *The Artemis,* 53 F.2d 672, 680 (S.D.N.Y.1931) (Woolsey, J.) (citing, *inter alia, The Susquehanna,* 3 F.2d 1014 (D.Mass.1923) (lien attached when health officials required that passengers' baggage be fumigated on land)); *see also Equilease, supra,* 793 F.2d at 604 (insurance is a necessary because it "is something that every vessel today needs just to carry on its normal business").

■ Containers and chassis, similarly, are necessary to the operation of a modern container ship not only when they are on board ship but also when they are being used to transport or store freight around the port area, or to load it on board. In this latter sense, they are no different from cranes or stevedores, both of which are incontestably "necessaries" under § 971. As Judge Knapp noted in *Atlantic & Gulf Stevedores, Inc. v. M.V. Rosa Roth,* 587 F.Supp. 1033, 1035 (S.D.N.Y.1984) (Knapp, J.), where the defendant vessel resisted imposition of a lien on unpaid stevedore services: "[T]he vessel was chartered out to carry freight; it needs no great expertise in admiralty to know that a vessel cannot fulfill that purpose without loading and unloading services such as those provided by plaintiff." *See also TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta,* 696 F.2d 1135, 1138 (5th Cir.1983) (lien on crane); *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,* 608 F.2d 197, 199 (5th Cir.1979) (lien on "shore crane").

■ This does not mean liens may attach only for those periods when a container or chassis was actively loading or unloading a vessel. According to Flexi-Van—and this is not disputed by the vessel owners—a shipping line or vessel needs as much as three times the number of containers the ship(s) can carry: As Flexi-Van explains it, to operate at maximum efficiency, there must be a ship's capacity of containers not only on board a ship, but also at the ports of embarkation and debarkation to be loaded aboard when the ship makes its call. *See* Foley Affidavit, ¶ 6. The situation is analogous to that in *Rosa Roth,* where Judge Knapp held that a maritime lien could properly be asserted for unpaid stevedore wages, including "non-work time" charges. Judge Knapp reasoned that without promise of payment for the non-work time, the stevedores would not have performed the job. Thus, while those charges "were not strictly necessary to enable the vessel to carry out its function," they were "necessaries" within § 971. *Rosa Roth, supra,* 587 F.Supp. at 1035. So here, container and chassis charges are "necessaries" even for the periods when the equipment was idle.

■ The vessel owners are persuasive, however, in their argument that a maritime lien would be inappropriate for container or chassis charges for periods when the equipment was used for a wholly non-maritime purpose, for example in train or air transport. At this stage of the proceedings, however, with nothing in the record to suggest that the equipment was used in anything but maritime commerce, this argument has little effect on the disposition of the instant motion. To see this issue in its proper context, it is useful to refer to the Second Circuit's opinion in *CTI–Container Leasing, supra,* 682 F.2d 377. There the issue was whether a container lease was a maritime contract such that it invoked the court's admiralty jurisdiction. The court rejected the defendant's argument that because the containers could have been used in a non-maritime form of commerce the equipment lacked a sufficient maritime flavor, noting that the lease itself as well as the identity of the parties (the defendant was a shipping agent) "point[s] to shipping as the envisioned mode of use of [the] containers." *Id.* at 381. So here, without further evidence that the equipment was used in anything but maritime commerce, circum-

scribing the liens sought by Flexi-Van would be inappropriate. If the vessel owners have evidence that the equipment was used outside of maritime commerce, they should present it at trial.[6]

The vessel owners also argue that the leased containers and chassis were not "furnished" to the vessels under the Act because Flexi-Van leased the equipment to the entire AES fleet rather than to specific vessels. The court finds that this contention runs contrary to the prevailing authority, reads the Act far too narrowly, and if followed would result in an outcome contrary to the statute's stated purpose of fostering marine commerce.

Since at least 1940, it has been clear that a lien may attach when services or supplies are provided to a fleet of vessels so long as title to any goods is not diverted to an intermediary. See Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 277, 60 S.Ct. 937, 941, 84 L.Ed. 1197 (1940). Thus, "for purposes of creating a valid maritime lien, it may not be essential, and indeed may not be desirable, that the container [or chassis] be ... earmarked for a particular vessel." Transamerica, supra, 1984 A.M.C. at 490.

A broad reading of the word "furnishing" seems especially ineluctable in light of the 1971 amendments to the Act, which "mandate a more liberal application than that which existed" previously. M/V Grand Loyalty, supra, 608 F.2d at 201; Payne v. SS Tropic Breeze, 423 F.2d 236 (1st Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); Transamerica, supra, 1984 A.M.C. at 490; see also H.R.Rep. No. 92–340, 92d Cong., 1st Sess. 1, reprinted in 1971 U.S.Code Cong. & Ad.News 1363–65. As a result, "[w]e find no persuasive reason to read the term 'furnishing' so narrowly...." Equilease, supra, 793 F.2d at 603.

The vessel owners' position seems especially unconvincing in light of the realities of container and chassis usage. The advantage this equipment offers is its transferability. If the equipment had to be earmarked for a particular vessel and (presumably) used only by that vessel, that advantage would be lost. As the court said in Equilease, "[t]he statute was intended to encourage private investment in the maritime industry. We will not begin now to defeat the purpose of the Act by layering technicalities onto its interpretation." Equilease, supra, 793 F.2d at 603.

Indeed, the vessel owners' argument on this score would barely warrant comment were it not for the Ninth Circuit's decision earlier this year in Foss Launch, supra, 808 F.2d 697. In Foss Launch, a majority of the panel, over a vigorous dissent, held that containers must be furnished to particular vessels rather than an entire fleet for a maritime lien to attach. Id. at 703. Although the Foss Launch holding is of course not binding on this court, like any appellate decision it is worthy of attention to gain insight into the issues presented.

The Foss Launch holding relies on an exegesis of the text of § 971 and on the Supreme Court's 1920 decision in Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920). The Foss Launch court's textual analysis is better read than explained:

> Stripped to its essentials, the statute states that "[a]ny person furnishing ... necessaries ... to any vessel...." We note initially that the verb "to furnish" as found in the statute appears in the form of the active and not the passive voice. For example, the statute could have been drafted to state that "necessaries that are furnished to any vessel" can support a maritime lien. In such circumstance [sic], it would have been possible for even the fortuitous application or use of necessaries by a vessel to

6. Also suitable for resolution at trial is the vessel owners' contention that Flexi-Van relied on the credit-worthiness of AES, rather than their security interest in the vessels themselves, when they entered into the leases. See Equilease, supra, 793 F.2d at 605–06. At this stage, that issue remains a contested issue of material fact.

create a valid maritime lien against a vessel. In creating a preferred class of secured creditors, Congress chose not to draft the Act in the passive voice and we think the correct inference is that Congress intended "furnishing" to require active forethought or advance identification of particular vessels in relation to "necessaries" supplied.

808 F.2d at 701 (emphasis in original).

With all due respect to the Ninth Circuit, the court finds this reasoning singularly unpersuasive. No matter what grammatical terms one affixes to these constructions, the court discerns no relevant distinction between them. Without support from the legislative history, there is simply no reason to believe that Congress's use of "[a]ny person furnishing ... necessaries" rather than "necessaries that are furnished" indicates anything about Congress's intentions with respect to the vessel-specific nature of maritime liens.

As noted above, *Foss Launch* also heavily relies on the Supreme Court's sixty-seven-year-old decision in *Piedmont*. A Supreme Court decision, of course, is always binding on this court. The well-recognized problem with *Piedmont*, however, is not whether to follow it, but how to follow it. As Professors Gilmore and Black have pointed out in their seminal treatise on admiralty law, *Piedmont* involves such a multiplicity of facts and such an absence of guidance as to which facts are relevant, that "not even the purest legal genius could have declared" what the case turns on. As a result, "[t]he Piedmont case is all things to all men and is regularly cited on both sides of every case in which it is relevant...." G. Gilmore & C. Black, *supra*, § 9–36 at 661.

In *Piedmont*, the Supreme Court denied a lien sought by a coal dealer against an oil company which owned a fleet of fishing steamers. It is unclear, however, on which potentially relevant fact the decision hinged: The coal company did not directly deliver coal to any vessel; the bill was sent to the oil company; the coal remained in the oil company's bins for long periods before delivery to particular ships; some of the coal was used by the factory rather than the vessels; and there was no agreement that the coal was to be used by any particular vessel or vessels.

In *Foss Launch, Piedmont* is a principal feature of both Judge Goodwin's majority opinion and Judge Anderson's dissent. Judge Goodwin cites the case as holding that a lien may attach only if a particular vessel is cited in the contract. 808 F.2d at 702. Judge Anderson argues that the case turns on the fact that the coal was delivered to the factory and there was no way to tell what maritime use, if any, was contemplated. *Id.* at 704.

■ It is the opinion of this court that *Piedmont* may be read to support either position. As a result, finding that all other indications point to an expansive reading of "furnishing," the court holds that "furnishing" in § 971 may support a lien on a fleet of vessels.[7]

Accordingly, the vessel owners' motion for partial summary judgment is denied.

IT IS SO ORDERED.

---

7. The vessel owners raise a number of other points, all but one of which are entirely without merit and are summarily denied. The exception is the owners' contention that Flexi-Van must mitigate its damages by reducing any recovery on the accelerated rent provisions by any rental income it earned on any repossessed equipment during the remainder of the lease terms. On this matter, they are entirely correct, and any damages Flexi-Van recovers will be adjusted accordingly.