**EXXON CORPORATION, Plaintiff,**

v.

**CENTRAL GULF LINES, INC., in personam and the M/V GREEN HARBOUR (ex William Hooper) in rem, her engines, boilers, tackle, etc. and a certain Letter of Credit No. P 621208 dated December 26, 1984 issued by the Chase Manhattan Bank, N.A., in rem., Defendants.**

No. 86 Civ. 9445 (WCC).

United States District Court,
S.D. New York.

July 21, 1989.

Nourse & Bowles, New York City, for plaintiff (Armand M. Pare, Jr., and Bradley F. Gandrup, Jr., of counsel.)

Bigham Englar Jones & Houston, New York City, for defendants (Francis A. Montbach, and Karin A. Schlosser, of counsel.)

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Exxon Corporation ("Exxon") moves for reconsideration of the Court's Opinion and Order, dated March 3, 1989, dismissing its claim for a maritime lien, under the Federal Maritime Lien Act (the "Act"),[1] for want of admiralty jurisdiction. *See Exxon Corporation v. Central Gulf Lines, Inc.*, 707 F.Supp. 155 (S.D.N.Y. 1989).

I have carefully considered "the matters [and] controlling decisions" which Exxon "believes the court has overlooked," Local Rule 3(j); *accord Ruiz v. The Commissioner of the Department of Transportation of the City of New York*, 687 F.Supp. 888, 890 (S.D.N.Y.), *aff'd* 858 F.2d 898 (2d Cir. 1988), but conclude that Exxon's claim was rightly dismissed.

## BACKGROUND

Familiarity with my March 3, 1989 Opinion is presumed. Defendant Central Gulf Lines, Inc. ("Central Gulf") owns a vessel, the Green Harbour ex William Hooper (the "Hooper"), upon which plaintiff has asserted a lien. The Hooper was chartered by the Waterman Steamship Corporation ("Waterman"), which for forty years used Exxon as its exclusive worldwide supplier of bunkers.

Under the contract governing the relationship between Exxon and Waterman in 1983, Waterman's fuel requirements were provided by the "Seller" (Exxon) or by "Supplying Companies." Exhibit 3 to Affidavit of James E. Sharkey [hereinafter Waterman/Exxon Contract]. Waterman made purchases under this agreement by telephoning Exxon in New York and providing Exxon with delivery information. Exxon would effect delivery on its own, or cause a local supplier to deliver the bunkers to the vessel. Exxon would invoice Waterman for the fuel supplied, and if a local supplier was used, pay the supplier.

The bunkers delivery which is the subject of this motion occurred on October 26, 1983, when the Hooper put in at Jeddah, Saudi Arabia. In order to fulfill its obligation to procure fuel for Waterman at that port, Exxon used a local supplier, Arabian Marine Operating Co., Ltd. ("Arabian Marine").

Exxon had promised Arabian Marine that it would "solicit and arrange for the sale of marine fuels to international customers having bunkering requirements at the port of Jeddah." In return for Exxon's services, Arabian Marine had agreed to pay Exxon a "commission." Exhibit 4 to Affidavit of James E. Sharkey ¶¶ 1 & 5 [hereinafter Exxon/Arabian Marine Contract].

In my March 3, 1989 Opinion, I found that Exxon's agreement to procure bunkers for Waterman in Saudi Arabia was outside of the Court's admiralty jurisdiction. I observed that the Second Circuit in *Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.*, 739 F.2d 798 (2d Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985), had reaffirmed the rule that "agency contracts under which a party agrees to solicit or procure freight, passengers, crew, or supplies for a vessel are not maritime contracts," 707 F.Supp. at 159, and concluded

---

**1.** The Act provides, in pertinent part:

Any person furnishing ... supplies ... or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by

the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971.

that Exxon's services with respect to the Saudi Arabian delivery constituted such a preliminary contract:

> Under the contract, Exxon served in two distinct capacities. Its first role was as a supplier of marine fuels. When Waterman vessels called at ports where Exxon maintains its own bunker stations, Exxon promised to physically deliver the bunkers. When the vessels, however, called at ports where Exxon depends on local suppliers, Exxon promised to arrange for the local suppliers to provide Waterman ships with fuel. When acting in this latter capacity, Exxon was merely Waterman's agent.

> Exxon wore its agency hat when it procured bunkers for the Hooper in Jeddah. Its services with respect to the Jeddah delivery included taking Waterman's order, contacting Arabian Marine, maintaining a bunkers contract with Arabian Marine, and advancing Waterman the purchase price by paying Arabian Marine. It never actually possessed the fuel that was supplied to the Hooper at Jeddah. Indeed, pursuant to Exxon's contract with Arabian Marine, title to the fuel passed directly from Arabian Marine to the Hooper. In return for these services, Exxon received a commission which was deducted from Arabian Marine's invoice to Exxon. In sum, Exxon's role in the transaction was strictly "shoreside," *E.S. Binnings* [v. M/V Saudi Riyadh], 815 F.2d [660] at 664 [11th Cir.1987]. As Exxon put it in its discussion of the choice of law issue, the locus of Exxon's relationship with Waterman was the United States, not the dock in Jeddah. *See* Plaintiff's Memorandum of Law at 16. Exxon's services were thus "preliminary"; they ended before the bunkers reached the Hooper.

707 F.Supp. at 160.

## DISCUSSION

Exxon offers four reasons why I erred in dismissing its lien on jurisdictional grounds: (1) Exxon sold the bunkers to Waterman; it was not Waterman's agent; (2) Exxon was not a general agent within the meaning of *Peralta;* it was a special agent and thus entitled to assert a maritime lien; (3) the Waterman/Exxon Contract was not a preliminary contract; and (4) Exxon extended credit to the Hooper, and can claim jurisdiction on that ground. Plaintiff also argues that "[i]n the event the Court considers no such lien exists ... further evidence should be allowed on the nature of the Exxon/Waterman Fuel Oil Contract" and that "any question of Exxon's rights under Saudi [law] should be reserved." Plaintiff's Brief at 28–29. I will address each argument individually, and then briefly discuss the merits of Exxon's underlying claim.

### I. *Agent or Seller*

■ Plaintiff first contends that the Waterman/Exxon Contract should be characterized as a sales contract, not an agency contract. "[A]t the very most a recasting of the contract would make any 'Supplying Company' a subcontractor of Exxon, and Exxon the contractor." Plaintiff's Brief at 9. I disagree.

It is well-settled that an agency relationship involves: (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; (4) control by the principal; and (5) power of the agent to alter the legal relations between the principal and third persons and between the principal and himself. *Boss v. Int'l Brotherhood of Boilermakers,* 567 F.Supp. 845, 847 n. 1 (N.D.N.Y.) (Miner, J.), *aff'd* 742 F.2d 1446 (1983), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *Restatement (Second) of Agency* §§ 12, 13 & 14 (1958).[2]

It is sometimes difficult, however, to distinguish between a seller or supplier and a mere agent. The Restatement suggests that "[o]ne who contracts to acquire property from a third person and convey it to another is the agent of the other only if it

---

2. Only the last three characteristics are at issue here. Since its relationship with Waterman is based on a contract, Exxon has not contended that consent is lacking. Moreover, presumably because fiduciary duty arises out of an agency relation, Exxon has not suggested that this element is absent.

is agreed that he is to act primarily for the benefit of the other and not for himself." *Id.* § 14K. The comment to that section explains:

> Factors indicating that the one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property. None of these factors is conclusive.

*Id.* comment a.[3] As the factors listed above suggest, an important difference between sellers and agents is the manner in which risk of loss and opportunity for gain are distributed:

> Who is to be affected by the fluctuations of the price is often significant. If the one who is to supply the goods is to do so at a fixed price regardless of market fluctuations, there is strong evidence of a sale rather than of agency. Upon whose responsibility are the goods to be procured, is also a significant question. If they are to be obtained upon the credit of the person, who is to supply them without possibility of recourse to the person to whom they are to be supplied, this is also strong evidence of a sale. Who is to determine of whom, where, to what extent, upon what terms, the goods to be supplied are to be procured? If the person who is to supply them is to determine these matters, [then the transaction may be a sale].

1 F. Mechem, *Law of Agency* § 46 (1914).

After reviewing the terms of both contracts involved in this case, I remain convinced that the elements of an agency relationship are satisfied here. First, Exxon's likelihood of profit or loss was fixed. Although Exxon asserts that its responsibility under the agreement was to "provide the minimum quantities of fuel irrespective of any difficulties it may have in obtaining the supplies," and that if it were an agent, it would have only had to use its "best efforts" to procure bunkers, Plaintiff's Brief at 5, Exxon's duties under the contract were in fact much less onerous then it claims. Practically, Exxon was only obligated to exercise its best efforts to procure fuel for Waterman. The contract permitted Exxon to escape performance where difficulties "not reasonably within [its] control" intervened and protected Exxon from fuel shortages caused by "any ... event." Waterman/Exxon Contract § 6.7(C) & (D). Moreover, the contract insulated Exxon from shifts in the market price of fuel, by basing the price of the bunkers on the local supplier's price. *Id.* § 4.1 (Waterman was charged "the established selling price effective for the time and place of delivery by Seller or Supplying Company"); *see also* Exxon/Arabian Marine Contract ¶¶ 4 & 5 ("The product price to be invoiced to Exxon ... shall be Arabian Marine's product selling price ... at the time of delivery.... Payment for each marine fuel delivery is to be made by Exxon to Arabian Marine.... In return for services performed by Exxon, Arabian Marine will pay Exxon a commission.... [which] shall be deducted from the invoice issued by Arabian Marine and from Exxon's payment to Arabian Marine."); *Exxon,* 707 F.Supp. at 160 ("Exxon received a commission which was deducted from Arabian Marine's invoice to Exxon"). Since, as I noted in my previous Opinion, Exxon never held title to the fuel provided by the local suppliers, *Exxon,* 707 F.Supp. at 157, 160, the risk of loss shifted directly from the local supplier to Waterman. *See* Waterman/Exxon Contract § 6.7(E) (bunkers were "pumped at the risk and peril of Seller or Supplying Company up to that flange only").[4]

---

**3.** Plaintiff asks the Court to consider the factors listed in the comment to Section 14J of the Restatement. Plaintiff's Reply Brief at 14–15. That subdivision is inapplicable, however, because it deals with distinguishing between an agent and a buyer, not an agent and a seller.

**4.** Exxon maintains that Section 2.1 of the Waterman/Exxon Contract gave rise to a "descriptive warranty" regarding the quality of the fuel delivered. *See* Plaintiff's Brief at 4. That Section provides:

Second, Exxon's performance under the contract was subject to Waterman's control. The gist of the contract was that, subject to minimum and maximum limits, Exxon would procure Waterman's fuel requirements. The only matter left to Exxon's discretion was which company would supply the fuel. This detail, however, was clearly immaterial to Waterman. Waterman was only interested in a worldwide supply of quality bunkers. It therefore retained control over fuel type and quality, as well as the method, location, and time of delivery. Waterman/Exxon Contract §§ 3.1 & 6.7(E).[5]

The Waterman/Exxon Contract empowered Exxon to alter Waterman's legal relationship with Arabian Marine. In the first place, the agreement authorized Exxon to "cause" local suppliers to sell fuel to Waterman. Waterman/Exxon Contract, preamble. Exxon could also obligate Waterman to indemnify the local supplier, see, e.g., id. § 6.2 ("Buyer shall reimburse

Seller or Supplying Company for all additional expenses incurred in connection with" after-hour deliveries), and refrain from asserting certain claims against it, see, e.g., id. § 6.7(A) ("Buyer waives any claim against Seller or Supplying Company with respect to quality, quantity or price" not asserted within 45 days after delivery). Moreover, the local supplier did not only depend on Exxon's credit. Exxon could give the local supplier a lien on the vessel. Id. § 6.7(B). If, on the other hand, Arabian Marine had supplied the bunkers only on Exxon's credit, "without possibility of recourse" to the vessel, there would have been "strong evidence of a sale." 1 F. Mechem, Law of Agency § 46.

In sum, the language of the Waterman/Exxon Contract suggests that where Exxon depended on local suppliers, it was not a seller of marine fuel; it merely served as an agent, using its best efforts to procure bunkers that would satisfy Waterman's fuel requirements.[6]

The Marine fuel to be sold hereunder shall be commercial grades of Bunker Fuel Oil and/or Intermediate Bunker Fuels and/or Marine Diesel Oil and/or Light Marine Diesel Oil and/or Marine Gas Oil offered at the time and place of delivery by Seller or by the Supplying/Delivering Company.... Buyer shall have the sole responsibility for the selection and acceptance of Marine Fuel for use in the vessels to which Marine Fuel is delivered. Nothing in this clause suggests that Exxon warranted the quality of fuel supplied by Arabian Marine. An express warranty by description is created only by the "seller." See N.Y.U. C.C. Law § 2–313 (McKinney 1964). When a local supplier was used, Exxon was not the "seller" within the meaning of the Uniform Commercial Code. See id. § 2–103(1)(d) (" 'Seller' means a person who sells or contracts to sell goods."); id. § 2–106 ("A 'sale' consists in the passing of title from the seller to the buyer for a price...."). Moreover, if there were any doubt that Exxon did not warrant the quality of fuel delivered by local companies, the final sentence of Section 2.1 would put that doubt to rest.

**5.** Plaintiff cites Fenton v. Freedman, 748 F.2d 1358 (9th Cir.1984), for the proposition that "if control may be exercised only as to the result of the services performed and not the means and methods by which it is accomplished, then the provider is an independent contractor and not an agent." Id. at 1362 (emphasis in original). This decision is based on California law, and I am not persuaded that the definition of agency is so limited under federal law. The only bind-

ing authority which plaintiff cites, In re Shulman Transport Enterprises, Inc., 744 F.2d 293 (2d Cir.1984), is distinguishable. In that case, an airline claimed that a freight forwarder acted as its agent in collecting the carrier rates which the forwarder charged the shipper. The court rejected that claim on the ground that under the airline's contract with the forwarder, the airline had expressed no interest in how the forwarder used the funds it received from its customers. The Waterman/Exxon Contract, on the other hand, makes it clear that Exxon's local supplier could sue Waterman in the event it was not paid. See Waterman/Exxon Contract § 6.7(B) ("it is agreed that Seller and Supplying Company will have and may assert a lien against such vessel for the amount of the delivered price of said Marine Fuel").

**6.** Exxon cites a number of cases that stand for the proposition that an independent contractor's use of a subcontractor does not transform it into an agent. See Farwest Steel Corp. v. Barge Sea–Span 241, 828 F.2d 522 (9th Cir.1987), cert. denied, —— U.S. ——, 108 S.Ct. 1594, 99 L.Ed.2d 909 (1988); Marine Coatings of Alabama, Inc. v. United States, 674 F.Supp. 819, 825 (S.D.Ala. 1987); Spyral Marine Services, Inc. v. M.T. Silver Lady, 82 Civ. 2313(ELP), Slip Op. (S.D.N.Y. January 31, 1983); The Juniata, 277 F. 438 (D.Md. 1922). Just because some independent contractors are not agents, and therefore entitled to sue in admiralty, does not mean that all independent contractors can bring such suits. An independent contractor may or may not be an agent.

## II. *The Scope of the Peralta Rule*

When the Court of Appeals for the Second Circuit decided *Peralta,* it was presented with the option of distinguishing that case from the principle that preliminary contracts, and in particular general agency contracts, are not cognizable in the admiralty jurisdiction. The *Peralta* court acknowledged that this anomalous exception to the broad coverage of maritime jurisdiction had "suffered some erosion in other circuits," but stressed that "neither the Supreme Court nor the courts of this Circuit have departed from [the] teachings [of *Minturn* and its progeny]." 739 F.2d at 803; *see also id.* at n. 4. It eschewed any attempt "[t]o predicate jurisdiction on ... hair-splitting distinctions," since such an effort "would blur, if not obliterate a rather clear admiralty demarcation." *Id.* at 802. Although, the *Peralta* court hoped that the Supreme Court would eliminate the preliminary contract rule by granting *certiorari, id.* at 804, the Supreme Court declined the invitation, 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985), and therefore left the law of this Circuit intact.

In its motion for reconsideration, plaintiff asks me to do what the Second Circuit refused to do in *Peralta:* Follow the other circuits which have carved exceptions out of the preliminary contract rule. I am convinced that further subdividing this area of the law would only serve to enhance confusion, and would violate the spirit of the *Peralta* decision.

### A. Special/General Agent Distinction

▮ Plaintiff argues that, at most, Exxon acted as Waterman's special agent, and cites cases distinguishing between special and general agents. I disagree with Exxon's contention that it was not a general agent.

Although the typical general agent in maritime cases performs husbanding services, as the Second Circuit has pointed out, *Ingersoll Milling Machine Co. v. M/V Bodena,* 829 F.2d 293, 302 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988), it is well settled that "[c]ontinuity of service rather than the extent of discretion or responsibility is the hall-mark of the general agency." *Restatement (Second) of Agency* § 3 comment a (1958); *accord Todd Shipyards Corp. v. The City of Athens,* 83 F.Supp. 67, 88 (D.Md.1949). A continuing relationship is particularly significant in maritime law, since a business relationship of substantial duration suggests an absence of reliance on a vessel's credit:

> The thing which characterizes a general agent as known in the maritime fraternity is a mutual interdependence on the financial credit and stability of each of the parties, agent and owner. The arrangement by its very nature contemplates that the agent must do many things in advance of the arrival or after the departure of the vessel. Reimbursement of his expenditures and the payment of his fees, whether by commissions on freight or otherwise, is not dependent upon the profitableness of that immediate venture. Here, on the other hand, this was a single-shot affair in which none of the parties dealt on the *credit* of the others. Presumably each took into account the general business integrity and reliability of the other.

*Compagnia Maritima La Empresa, S.A. v. Pickard,* 320 F.2d 829, 832 (5th Cir.1963) (emphasis in original).[7]

---

It is only colloquially that the terms are necessarily distinct. *Columbia Broadcasting System, Inc. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 375 & n. 14 (2d Cir.1975). The large amount of control retained by Waterman and the lack of risk assumed by Exxon indicate that Exxon, whether or not an independent contractor, was an agent, not entitled to a maritime lien.

7. Long-standing agency relationships are considered general agencies in admiralty law because the agent typically relies on the credit of his principal, rather than on that of the vessel. It does not follow, however, that an agent who serves a principal in a series of transactions can claim that he is a special agent or otherwise entitled to a lien if he can prove that he relied on the credit of the vessel. Such a standard would demand "unmanageable burdens of proof concerning the nature of the credit extended." Comment, *General Agency Agreements and Admiralty Jurisdiction,* 17 Conn.L.Rev. 595, 608 (1985). *But see M. Vivian Pierce,* 48 F.2d 644, 645 (D.Mass.1931) (*dictum*).

Exxon was Waterman's sole procurer of bunkers for forty years. Moreover, its authority, with respect to the business of obtaining fuel for Waterman vessels, was quite broad. As plaintiff put it, "[i]t was Exxon who solely determined the physical supplier under the Contract ...; [and] it was Exxon who had the right to determine allocation of supplies in the event of shortage of oil among Exxon's various customers." Plaintiff's Reply Brief at 12. I am thus persuaded that plaintiff was Waterman's general agent with respect to fuel supplies.

■ Even if Exxon had acted as a special agent, I would dismiss this case for lack of subject matter jurisdiction, since special agents that provide preliminary services are outside the admiralty jurisdiction. As Exxon readily admits, Plaintiff's Reply Brief at 9 n. 4, I rejected the idea of a special/general agent distinction in my decision granting summary judgment in defendant's favor:

> "[I]t would be anomalous to hold that a general agency agreement" to, among other things, arrange for fuel supplies "is outside admiralty, while an agreement between a principal" and an agent who has procured bunkers for the vessel "falls within the grant of jurisdiction." *See Continental Cameras Co. v. FOA & Son Corp,* 658 F.Supp. 287, 289 (S.D. N.Y.) (Sand, J.) (insurance broker), *aff'd* 831 F.2d 45 (2d Cir.1987) (per curiam); *see also Boyd, Weir & Sewell, Inc. v. Fritzen–Halcyon, Lijn, Inc.,* 709 F.Supp. 77 (S.D.N.Y.1989) (Cannella, J.) (chartering agent).

707 F.Supp. at 160–61. Exxon nevertheless argues that I overlooked case law recognizing such a distinction. Its primary support for this contention is a student-written article, Comment, *General Agency Agreements and Admiralty Jurisdiction,* 17 Conn.L.Rev. 596 (1985) [hereinafter Comment].

Yet, as the Comment itself points out, the Second Circuit has refused to distinguish between general and special agents. "The Second Circuit approach ... views general agency agreements as equivalent to brokerage agreements and excludes both from admiralty." *Id.* at 623. "This confusion probably stemmed from the loose use of the word 'agent' as a practical equivalent of 'broker' in several early cases." *Id.* at 612. The Comment adds that, although there is one case, *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T.S. Salzachtal,* 373 F.Supp. 267 (E.D.N.Y. 1974), which allowed a special agent to assert a lien, this case "is an enigma in Second Circuit case law." Comment at 608 n. 53.

The Comment maintains, however, that the Second Circuit cases are wrongly decided. Thus the author claims that Judge Weinfeld's decision in *P.D. Marchessini & Co. v. Pacific Marine Corp.,* 227 F.Supp. 17 (S.D.N.Y.1964), "erroneously applied case law directed at brokers to exclude a general agent from admiralty." Comment at 614. And Judge Learned Hand's analysis in *Admiral Oriental Line v. United States,* 86 F.2d 201 (2d Cir.1936), is considered "similarly flawed." The Comment also states that Professor Moore "confuses the rights of general agents with those of brokers," since "of the ten cases cited [on this issue in his treatise], six are from the Second Circuit." Comment at 616 n. 86 (citing 7A J. Moore, A. Pelaez, *Moore's Federal Practice,* ¶.250 n. 1 (2d ed.1983) [hereinafter *Moore's* ]).

I decline to recognize a distinction that courts in this Circuit have eschewed for decades. Although there may be historical grounds to hold that special agency contracts are maritime, I am persuaded that differentiating between special and general agents would be irrational. As one commentator explained:

> To extend maritime jurisdiction to such a "specific" agent rather than to one who, on a continuing basis, procures all sorts of services, both necessary and unnecessary, is not a rational distinction..... A "specific" agent who merely procures services is performing shoreside preliminary functions, regardless of how necessary they are to the operation of the vessel. The decisions, therefore, have stressed the subject matter of the claim,

**1036**

i.e. the duties performed by the agent, rather than the nomenclature of the agent.

McAllister, *Admiralty Jurisdiction Extends to Agent Who Actually Performs Essential Services for Vessel,* 4 J.Mar.L. & Com. 480, 490 (1973).

■ Moreover, Judge Lumbard recently applied the *Peralta* rule to a case involving a special agent. In *Johnson Products Co. v. M/V La Molinera,* 619 F.Supp. 764 (S.D. N.Y.1985), a freight forwarder argued that the shipper's claims were "not within the Court's admiralty and maritime jurisdiction because they derive essentially from an agency relationship—not a maritime contract—between the plaintiffs and [the freight forwarder]." *Id.* at 765. Judge Lumbard agreed that this special agency contract was not maritime:

> As freight forwarder, ICS performed a variety of services preliminary to JPC's procurement of an actual carrier. Although the *carrier's* obligation to the shipper certainly comes within the Court's admiralty jurisdiction, the obligations arising out of preliminary procurement of and arrangement for carriage contracts do not. *See Peralta Shipping Corp. v. Smith Johnson (shipping),* 739 F.2d 798 (2d Cir.1984); *P.D. Marchessini & Co. v. Pacific Marine Corp.,* 227 F.Supp. 17 (S.D.N.Y.1964) (Weinfeld, J.).

*Id.* at 766–67 (emphasis in original). In sum, the *Peralta* rule is not limited to general agency contracts.

### B. The Preliminary Contract Rule

Exxon contends that the Waterman/Exxon Contract was not a preliminary contract. First, it maintains that the preliminary contract rule and the general agency rule have been accidentally fused by the courts in this Circuit. *See* Plaintiff's Brief at 27. Again, however, Exxon's primary support is the student-written Comment:

> The court [in *Cory Bros. & Co. v. United States,* 51 F.2d 1010 (2d Cir.1931)] first cited in full that section of the *Thames* that called for the exclusion from admiralty of preliminary service contracts, a proper reference considering that the

court was addressing the cargo broker aspects of the contract. The court immediately followed this reference, however, with the comment: *'Apparently the same ground explains the holding in Minturn v. Maynard.'* No single sentence in the entire body of case law concerning general agency agreements has done more to distort their proper interpretation; the *Cory Bros.* court, because of its complete misunderstanding of *Minturn,* carelessly merged two bodies of entirely unrelated case law.

Comment at 612–13 (emphasis in original; footnotes omitted), *quoted in* Plaintiff's Brief at 27–28.

It would be inappropriate for me to disentangle the preliminary contract rule from the general agency rule. The Second Circuit recently described the agency rule as a subset of the preliminary contract rule:

> A long-recognized principle for determining whether a contract is maritime is that agreements preliminary to maritime contracts are not cognizable in admiralty.... Applying this principle, our Court, despite questioning its continuing validity, has recently affirmed the long-standing, well settled rule laid down by the Supreme Court in *Minturn v. Maynard* ... that general agency contracts are not cognizable in admiralty....

*Ingersoll Milling,* 829 F.2d at 301–02. Moreover, I am not persuaded that the two principles should be distinct, since the agency exception to maritime jurisdiction is less of an anomaly when viewed as a subset of the preliminary contract doctrine.

■ Finally, the services performed by Exxon were merely preliminary. Exxon contends that since there was no written agreement between Waterman and Arabian Marine, the Waterman/Exxon Contract was not preliminary to a maritime contract. Plaintiff's Brief at 26. I disagree.

The Waterman/Exxon Contract authorized Exxon to create a contractual relationship between Waterman and Arabian Marine. Exxon agreed "to sell or cause [fuel] to be sold" to Waterman.

Waterman/Exxon Contract, preamble. Where Exxon merely "caused" local suppliers to sell bunkers to Waterman, it promised to advance the suppliers payment for the fuel. In the event that Exxon defaulted, the local suppliers could look to Waterman. *Id.* § 6.7(B).

Moreover, the Exxon/Arabian Marine Contract "covers the solicitation of bunker customers by Exxon and *the sale and delivery of marine fuels as bunkers by Arabian Marine to such customers* at the port of Jeddah, Saudi Arabia." Exxon/Arabian Marine Contract ¶ 1 (emphasis supplied).

In sum, even if Waterman and Arabian Marine did not enter into their own written contract,[8] they were bound to each other by the agreements that Exxon, as agent, entered into with each of them. The Waterman/Exxon Contract was thus preliminary to a contract between Waterman and Arabian Marine for the sale of bunkers.

III. *The Extension of Credit*

■ Plaintiff also asks me to revisit the question whether admiralty jurisdiction can be based on the fact that Exxon furnished the Hooper with credit necessary to obtain the fuel. This contention was considered in my initial decision:

[I]t might be argued that Exxon furnished the Hooper with the credit it needed to obtain the fuel, and thus was not a mere agent.... Defendant suggests, however, that a lien claimed by virtue of Exxon's extension of credit would arise only by subrogation, and would be governed by Saudi Arabian law. *See* Defendant's Memorandum of Law at 7–9. Although this may not be the case, *see Universal Shipping v. The Panamanian Flag Barge*, 563 F.2d 483, 484 (1st Cir.1976) (*dictum* distinguishing lien arising by subrogation when advance is given to discharge an existing lien from lien arising when advance is made for the purpose of permitting vessel to purchase other necessaries), plaintiff has not claimed a lien on the ground that it ad-

vanced the Hooper the funds needed to refuel, *see* Plaintiff's Reply Memorandum at 14. Moreover, the *Minturn* case itself involved a general agent who had "laid out" and "expended" funds for the ship "in paying for supplies." The Court nevertheless concluded that there was "nothing in the nature of a maritime contract in the case." *Minturn* [*v. Maynard* ], 58 U.S. [477] at 477 [15 L.Ed. 235].

707 F.Supp. at 161.

Ordinarily, one who advances money to a ship for the purpose of satisfying an outstanding or future maritime lien, is entitled to a lien by virtue of subrogation. *The Emily B. Souder*, 84 U.S. (17 Wall.) 666, 21 L.Ed. 683 (1873); *see also* Ray, *Maritime Contract Liens*, 47 Tul.L.Rev. 587, 599 (1973) ("One who makes advances to pay for the necessaries that give rise to a maritime lien stands in the shoes of the supplier whose claim has been paid."). Such an advance is apparently considered a maritime contract.

Yet a brokerage contract, under which an agent provides services preliminary to a maritime contract, cannot be "bootstrapped" into admiralty jurisdiction simply because the agent has paid for the maritime services procured. Professor Moore explains:

Can, for instance, an agent who has expended his own money for maritime services or supplies furnished to the principal's vessel recover all, or the balance due, of such expenditures in a maritime action? While such agreements are not classic indemnity agreements, there is usually expressed or implied in such undertakings a provision that the agent will be indemnified for all reasonable expenses incurred on the principal's behalf. And, notwithstanding that indemnity agreements have been deemed maritime when contained in certain contracts, such as stevedoring, they have uniformly been deemed beyond the admiralty when between principals and agents.

8. The delivery receipt is a written document that can be considered a contract between Ara-

bian Marine and Waterman. *See* Exxon/Arabian Marine Contract ¶ 9.

*Moore's* ¶ 2.60[4] (footnotes omitted). Thus courts in this Circuit have held that general agency contracts are non-maritime, even where the agent has advanced funds for needed supplies. *See, e.g., Garcia & Diaz, Inc. v. Empresa Naviera De Cuba, S.A.,* 158 F.Supp. 147, 147 (S.D.N.Y.1958) (case dismissed for want of admiralty jurisdiction: "The general rule, that [a general] agent acquires no maritime lien for payments made by it in the course of its business is well settled."). And, on apparently the same basis, Judge Haight has suggested that an insurance broker may not sue in admiralty to recover premiums advanced on the vessel owner's behalf. *Frank B. Hall & Co. v. S.S. Seafreeze Atlantic,* 423 F.Supp. 1205, 1209–10 (S.D.N.Y.1976).

Although the authorities do not explain the rationale underlying this principle, I believe that it can be understood as a means of limiting the use of maritime statutes, and in particular the granting of maritime liens, to cases where they are necessary to further maritime commerce. While "[m]oneys are not usually loaned to strangers, residents of distant and foreign countries, without security," *The Emily B. Souder,* 84 U.S. at 671, federal intervention is not needed to induce a ship's agent, who has a continuing and substantial relationship with the owner or charterer of the vessel, to lay out funds. Indeed, while some courts have suggested that the important inquiry is not whether the advance itself is necessary, but whether the money has gone toward payment for a necessary, *see The Minnie & Emma,* 21 F.2d 991, 992 (D.Md.1927), there is no need to grant jurisdiction to brokers who advance the vessel funds in the ordinary course of the agency relationship. Even the Comment, once again relied on by plaintiff, admits that an agent may be disallowed a lien for advances if they are made "in the ordinary course of his agency." Comment at 620 n. 102.[9]

Exxon's extension of credit appears to have been incidental to its long-standing agency relationship with Waterman, which by itself would not be considered maritime. I am convinced that the admiralty jurisdiction should not be expanded to include the claim of Exxon, who, in the ordinary course of performing its long-term contract to procure bunkers for Waterman vessels, advanced funds for the fuel that it procured.

Exxon has failed to cite any binding authority to the contrary, and even the one case that it cites from this district, *Martran v. Steamship Co. v. Aegean Tankers Ltd.,* 170 F.Supp. 477 (S.D.N.Y.1959), is very different from the facts here. That case involved an owner's action against a sub-charterer for fuel paid for by the owner. *Id.* at 478–89. The court did not discuss whether an agent that procures and pays for bunkers can bring a suit in admiralty against the vessel. I conclude that such cases are outside the admiralty jurisdiction.[10]

### IV. *The Need for Further Evidence*

I see no reason to allow plaintiff to present further evidence regarding the nature of the Waterman/Exxon contract at this time. Plaintiff merely asserts the need for such a presentation, and offers no explanation as to how such a procedure might be helpful. "An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion." *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97,

---

9. Although the Comment concedes this point, its position on the issue of advances is otherwise at odds with the law of this Circuit.

One acting as a special agent can assert a lien upon a vessel if his primary function is to procure and pay for necessary services and supplies. A general agent who fulfills the very same functions has at least an in personam right against an owner if he exercised a great degree of control over the vessel.
.... Under this approach, therefore, the contract in *Peralta* which involved an agreement to provide or pay for a number of necessary services, should have been found maritime. Comment at 624 (footnotes omitted).

10. Since I am persuaded that Exxon cannot claim a subrogated lien, I need not reach the question of whether such a lien would exist under Saudi Arabian law. Consequently, Exxon's request to submit evidence on Saudi Arabian law is denied.

107 (2d Cir.1981) (quoting *Neely v. St. Paul Fire & Marine Insurance Co.*, 584 F.2d 341, 344 (9th Cir.1978) (Palmieri, J.)). The request is therefore denied.

## CONCLUSION

For the reasons stated above, plaintiff's motion for reconsideration of my Opinion and Order dated March 3, 1989 is denied.

SO ORDERED.